All right, our fourth case for this morning is United States v. Florentina Segura. Mr. Beal. May it please the court and counsel. The principal contention of the defendant is that Judge Chang should have determined whether the Fifth Amendment could have been properly invoked for each question proposed to be asked of the two witnesses rather than allowing the two witnesses to not testify at all. Now, Mr. Beal, I know it's done that way a lot, but it seems to me that you are making a pretty expansive claim that it's beyond the discretion of a district court judge in a particular situation simply to accord blanket Fifth Amendment protection for somebody. Because that's essentially what Judge Chang did. He heard about what she wanted to get from Mr. Barajas and Ms. Johnson. He decides that this is just too close to criminal incrimination. This whole scheme was something well known to the district court. So he just says, I'm going to recognize your Fifth Amendment immunity. So is it your position that this is just never all right for a district court? Well, I would say it's certainly in the context of this case in the particular that I'll mention in just a minute, works such a harm to her ability to present a defense that it's not permissible in the context of this case at the very least. Do you know of any case where the judge could compel the prosecutor to give immunity? The ability of the court to... No. I'm saying do you know of any case which says that the court has the power to direct the prosecutor to give immunity to a witness? No, Judge. There are cases that say they have the ability to dismiss the case if the prosecutor doesn't, but not to... Which case is that? They're cited in the brief. In fact, I think that Hooks reserves that. It doesn't find it in the context of that case. And the Third Circuit has said the same thing. Well, courts have put this little asterisk off to the side saying we hate to say the word never. And so maybe there'll be cases, and I think what Judge Bauer is saying is my impression as well, I can't find them if they're out there. In the end, aren't Judges Chang and Castillo entitled to use their own individual discretion based on whatever the individual facts and procedural posture of the matter before them is to determine when someone may assert a Fifth Amendment privilege? Why would it ever matter that one ruled one way in a grand jury proceeding and another ruled another pursuant to a motion that they both have discretion? Well, what I would say to that is in the facts of this case that Judge Chang has abused his discretion because we have a situation where these two witnesses were the defendant's only witnesses, and without them she was left there. Isn't there a separation of powers problem? That's, for example, this Third Circuit en banc which reversed the errant Third Circuit case that said that the court could require the prosecutor. That's why they worked the approach of you can't order the prosecutor to give immunity, but you can dismiss the case if they don't in a sufficiently egregious situation. So that's how they got around the separation of powers approach. But I want to put you a little more evidence with the witnesses have supplied that she herself could apply. Your Honor, my answer to that is that that, to a certain extent, misperceives the role that witnesses play in a jury trial, which is if the defendant's up there by herself with no corroboration and just giving her own version, it's very different than if she talks about what happened and then two other human beings get up and elaborate and corroborate that. Because the issue here is not whether this fact is true or that fact is true. The question is whether the defendant is credible in her testimony. But the most that these witnesses could have said is we were present at these meetings, the Queen or whatever we're supposed to call her, Queen, said all these things. But critical to Ms. Segura's conviction is her knowledge when she signs this tax return and she claims the $300,000 refund that she wasn't entitled to this money. And I don't see how these witnesses help us one way or the other on that. Not on the question of whether she saw what was on the forms. I think the testimony is uncontroverted. The Queen filled out these forms, but Ms. Segura signed them. She signed them. And so these other people, Barazza and Johnson, can say, yeah, we were there at the meetings. Here's how the Queen described this scheme or this case, which is what did Ms. Segura submit to the IRS? Was she violating the law, the mail fraud statute and the false claims statute, when she did so? But the question is how the forms were prepared and was it credible that she may very well not have seen what was on the forms when the Queen gave her all these different forms to sign, because the forms that were submitted were not the only forms that were signed. There were a lot of forms and Ms. Segura described how this process worked and these witnesses could have corroborated how there were all these forms and they had to sign this whole stack of forms. And I don't know what the witnesses would have said about whether they actually read the forms when they signed them. And if they did or didn't? Why would it matter if they did or didn't? Well, that would make Ms. Segura's claim that she hadn't actually read the attestation and the indication of what the information was that was going to the witnesses had done the same thing when they signed their forms. I mean, it's a little bit like propensity, except it seems that she would be saying, because these other people weren't paying attention, you have to think I wasn't paying attention either. I mean, we have the same thing in mortgage fraud cases all the time, where you have the HUD-1 and the person's closing and all these documents are signed. And did the person read the HUD-1 and know what was on there? This is very much the same thing as that. That's a common question in a mortgage fraud trial. And it's the same thing here. And if you have someone else saying, I did the same thing, that's corroborative of Ms. Segura's statement that she lacked the intent. Or just two crooks. Well, that's another interpretation. That's for the jury to decide, if they get all the evidence and they didn't get the testimony of the two witnesses. Can you save some time, Mr. Buol? Oh, I'd just make one more point, and that was that it's our position that the witnesses had no need for the protection because there's no indication that they would have actually been prosecuted. But nothing would have stopped the government from prosecuting them, even if they never actually received a refund. Right. We asserted that no one who hadn't gotten a check from the IRS had ever been prosecuted. Twenty of these Morris Temple people had been. I'm not sure how far that gets you. I mean, that would be like saying today in the world of the Trump administration, if you're out there in Colorado, you should just get up there and say, yeah, you know, I smoke marijuana all the time because it's legal in Colorado. And the government under the Obama administration had a policy of not prosecuting if the state law made it legal. But that may be a different view now. Well, I would just say I challenged the government, and they never came back and said, yes, we really think that. Well, they're not going to pre-commit to prosecute, but they could. And doesn't it make sense for the government to first prosecute, you know, those who received funds in the hope of recovering those funds before they turn to the prosecution of the rest? Well, I don't think they ever did prosecute before or since the rest. I mean, they were only interested in, I mean, the record indicates that they were only interested in the people to receive the checks. OK. I'll give you a full minute on rebuttal, Mr. Beal. So fear not. We ask your questions. Mr. Dale. May it please the court. Counsel, good morning. Your Honor, the Fugitive Disentitlement Doctrine does preclude relief on behalf of Miss Agoura. Now, that doctrine's discretionary, though. I mean, we haven't discussed it with Mr. Beal, but it's up to the court, right, to decide whether we wish to do that or reach the merits. Absolutely, Your Honor, which is why we went ahead and addressed the merits. It certainly is discretionary, but under Jacobs, we contend that it warrants dismissal in this case. But turning to the merits. But there have been a lot of cases like this that have been coming up. This was quite the scheme that this Moorish science temple was running. And so it's not clear to me whether Miss Agoura might try to come back to the United States, whether there's some more general benefit for our addressing the legal arguments here. You wouldn't say, you're not saying the case is moot, are you? I'm sorry, what's that? You're not saying it's a moot case, are you? I'm not saying it's moot, but I am saying under Jacobs, and this court's holding in that case, there's no indication she's going to come back, and we do believe it warrants dismissal. Can she be extradited, Mr. Dale? I didn't hear the question. I'm sorry, Your Honor. Can Miss Agoura be extradited? Yes, she can. So, Your Honor, but turning to the merits of this case, and I think, Your Honor, hit on a significant point, and that is that here, Judge Chang, the court did not abuse its discretion in just altogether accepting the Fifth Amendment privilege and vocation and deciding that the witness did not have to take the stand altogether because the court, of course, had the discretion to do so, but in this case, it made sense because of the nature and the posture of the case. Namely, Mrs. Johnson, in order for the testimony of either of the witnesses to be helpful, they would have had to get into what happened at the meetings, and that, of course, on cross-examination would have led to questions about their own conduct in that meeting and their own knowledge and things they did and heard, and that would, of course, led to them incriminating themselves, possibly, on cross-examination. So the judge did not abuse his discretion. And speaking of things that, you know, have been done, has this queen been prosecuted for any of these crimes? Has she been a witness in any of the other cases? No, Your Honor. Not to my knowledge. She's not been a witness, and she has not been charged. So in this case... But Ms. Johnson and Mr. Barajas did submit the fraudulent 1041s. They just did. The IRS actually caught some of these and didn't pay, right? Absolutely, Your Honor. Well, to be clear, Ms. Johnson certainly did. She admitted that she did submit, and we did have evidence that she had submitted three in her name, and Mr. Barajas proffered, or at least through counsel, through counsel, apparently Mr. Barajas was the defendant's friend, and so counsel proffered that he also submitted one. But that's the one you couldn't find, right? That's the one we could not find. But, of course, on questioning, we would have asked him that, and so the judge did not abuse his discretion in accepting that invocation, given that that would have likely come up on cross-examination. So he did not. Because, of course, it precludes not only the actual question, but the Fifth Amendment also prohibits any question that would first link in the chain, and Judge Chang relied on that in saying, I'm just going to accept their blanket invocations. Now, Mr. Beal points out, though, that it's really very commonly done, and I think understood probably to be better practice for the Fifth Amendment to be invoked question by question. There are possible questions that wouldn't in any way implicate someone in criminal behavior. You know, are you a person who attends the Moorish Science Temple? Well, yes you are, no you aren't, but I don't see why that in and of itself is an incriminating question. I think there's two things that are important about that. Number one, the posture. In other words, what Mr. Beal was saying was, I want these witnesses to corroborate more than just I attended, but I was there at meetings when packages were prepared, when tax activity occurred. And so from a practical standpoint, to get the corroboration, to get what he needed from the witnesses, what he sought from those witnesses, that would have opened up necessarily, given the broad-ranging nature of cross-examination. So that's number one, it would have opened up. In other words, the witnesses wouldn't have been helpful if they couldn't have gotten into what Mr. Beal wanted them to get into. Well, you're saying as soon as they get into what's helpful, the cross-examination possibility opens up, which is the incriminating side. That's right, exactly. And I think one of the judges made the point that it's discretionary, and so two judges can do two different things. It's Judge Rovner who pointed that out. Judge Rovner, I'm sorry. Judge Rovner pointed that out. And so getting quickly, I know Judge Bauer asked some questions about the due process argument, and I think that's true. There are no cases that ever said that we're going to dismiss an indictment because of the refusal to grant immunity, and this is certainly not that case where there's no dispute surrounding the facts on which the defendant wanted corroboration. And so the judge did not abuse his discretion in finding that the defendant did not meet their burden to show that we, by substantial evidence, intended to distort the fact-finding process. So is it your position that the testimony of Mr. Barajas and Ms. Johnson was essentially cumulative? Because that strikes me as a little bit harsh. You know, I can imagine a criminal trial, and if just the defendant stands there and says something, the jury will think, I don't know. But if a couple of other people have the same story to tell, it does bolster the defendant's story. Your Honor, I think the answer is yes. It is our position that it is certainly somewhat cumulative. I think the difference, the key point, is that there was no dispute over those facts to which the defendant wanted corroboration. It's perhaps somewhat bolstering. We acknowledge that it's somewhat bolstering if people say the same thing, but in this context where there's really no dispute, the government wasn't coming back and challenging those things, saying that that didn't happen. In that case, we think that definitely militates towards it just being purely cumulative. But the government wasn't standing up and saying, for example, there's a stipulation that the following events occurred. That would be a more attractive position to say, well, then we don't need this parade of witnesses to come through. Certainly there was no stipulation, Your Honor. But in closing, the closing argument, we certainly acknowledged and said openly that the Queen was involved. The Queen led the charge on these 1041s, and that's what we said in closing, in our closing argument. And so just given all of those circumstances, we acknowledge that it would have been somewhat bolstering, but certainly we also agreed that it was somewhat cumulative as well. In closing, Your Honor, for the reasons that we identified in our briefs, we ask that this court affirm the district court's ruling. All right.  All right, Mr. Beal, I said I would give you a final minute. Very briefly. I know the lawyers always say that. I would just point out that there were questions such as one witness, Barajas, introducing Ms. Segura to the Queen in the context of her husband's case, not this case, which are particularly hard to see. The ex-husband? I can't remember which husband. Ex-husband, yes. Her ex-husband. We're particularly not unincriminating, and it's only when you get to the question. I think the decision as to whether or not the answer might incriminate it belongs to the witness, not to anybody else. I think it belongs to the judge, I think, under the law. Then a witness can take the Fifth Amendment predicated on his belief that he may be prosecuted. But it has to be a reasonable belief. I don't think it has to be reasonable at all. He just says I tend to incriminate. In order to find out what he suspects might be criminal, he'd have to incriminate himself. I actually would. The tale goes all around and around. I would take issue with that. If you assume that the prosecution knows that they're not going to prosecute, that's even not material. He may have committed another crime in exposing himself to that sort of thing, perjury, for instance. Well, when I've been in front of Judge Castillo, he makes you tell him about that stuff before he lets you invoke the privilege. What you're suggesting, though, is that the witness has to expose himself by explaining why he would incriminate himself, thereby re-incriminating himself. Well, that's what happens with defense witnesses who are called before the grand jury and inconsistent practice in the district court. Anyhow, you did a noble job, and the court should thank you. Thank you. Yes, I do thank you, actually. You accepted this by appointment. We appreciate your efforts very much. And thanks as well to the government. We will take the case under advisement, and the court will again take a brief recess.